## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ERNEST B. HAIRE**
**a/k/a Ernie Haire, III,**

      **Plaintiff,**

**v.**                    **Case No.  8:05-cv-1018-T-30MSS**

**KELLY J. THOMAS,**

      **Defendant.**

_____/

## <u>ORDER</u>

THIS CAUSE comes before the Court upon Defendant's Motion to Dismiss (Dkt. #40), Defendant's Memorandum of Points and Authorities in Support of the Defendant's Motion to Dismiss (Dkt. #41-1), Plaintiff's Response to the Memorandum of Points and Authorities in Support of the Defendant's Motion to Dismiss (Dkt. #47), Plaintiff's Motion for Leave to Conduct Limited Discovery Prior to Mediation or, Alternatively, to Defer Mediation (Dkt. #44), and Defendant's Response to Plaintiff's Motion for Leave to Conduct Limited Discovery Prior to Mediation or, Alternatively, to Defer Mediation (Dkt. # 45).  The Court, having considered the motion, memoranda, and being otherwise advised in the premises, finds that Defendant's Motion to Dismiss should be granted and Plaintiff's Motion for Leave to Conduct Limited Discovery Prior to Mediation or, Alternatively, to Defer Mediation should be denied as moot.

## I.    BACKGROUND.

In Plaintiff's Second Amended Complaint, Plaintiff, Ernest B. Haire a/k/a Ernie Haire, III (hereinafter referred to as either "Haire" or "Plaintiff"), seeks to recover damages from FBI Special Agent Kelly Thomas (hereinafter referred to as either "Thomas" or "Defendant") for an alleged violation of Plaintiff's Fourth Amendment rights.[1]  Specifically, Plaintiff alleges that Thomas executed an affidavit in support of an application for a search warrant for Plaintiff's residence (the "Affidavit") and that the Affidavit contained numerous statements Thomas knew to be false.[2]  Plaintiff further alleges that Magistrate Judge Scriven relied on these statements when she issued the search warrant.  Additionally, Plaintiff seeks a permanent injunction against Defendant, Defendant's agents, servants, employees, attorneys and any person in participation with Defendant.[3]

Defendant has moved to dismiss Count I of Plaintiff's Second Amended Complaint pursuant to Rule 12(b)(6) on the grounds that Thomas is entitled to qualified immunity and Count II of Plaintiff's Second Amended Complaint pursuant to Rule 12(b)(1) on the grounds that this Court lacks jurisdiction over Plaintiff's claim for a permanent injunction.

## II.    QUALIFIED IMMUNITY.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their

---

[1] See Dkt. #33.

[2] See Dkt. #41-2.

[3] Apparently, Plaintiff is also seeking an injunction against further investigation of him by the FBI.

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir. 1988). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Qualified immunity is a defense not only from liability, but from suit, which makes it important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible. See Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1184 (11th Cir. 1994).

### A.    Two-step Analysis.

The test for whether a governmental defendant is entitled to qualified immunity from liability in his or her individual capacity involves a two-step analysis. First, the government official must demonstrate that he was "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Rich, 841 F.2d 1558, 1562-64. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." Migut v. Flynn, 131 Fed. Appx. 262, 264 (11th Cir. 2005).[4]

Second, if the government official satisfies his burden, the plaintiff must show that the official's actions violated clearly established constitutional law. See Harbert Int'l., Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998). Under this prong, the court must determine

_____

[4] It is undisputed that Defendant Thomas was acting in his capacity as a special agent for the FBI at the time of executing and submitting the Affidavit at issue. See Dkt. #33, Paragraphs 6, 8, and 11.

whether the applicable law was clearly established at the time of the challenged action.  <u>See</u>

<u>Id</u>.  The relevant inquiry is "fact specific," and a plaintiff must point to a controlling case,

decided before the events at issue, that establishes a constitutional violation on "materially

similar" facts.  <u>See</u> <u>Rodgers v. Horsley</u>, 39 F.3d 308, 311 (11th Cir. 1994); <u>see also</u> <u>Lassiter</u>

<u>v. Alabama A & M Univ., Bd. Of Trustees</u>, 28 F.3d 1146, 1150 (11th Cir. 1994).  "The

contours of the right must be sufficiently clear that a reasonable official would understand

that what he is doing violates that right."  <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).

Absent a controlling and factually on-point case, a plaintiff can overcome qualified immunity

only when "the official's conduct lies so obviously at the core" of what the constitutional

provision forbids "that the unlawfulness of the conduct was readily apparent to the official,

notwithstanding the lack of case law."  <u>Smith v. Mattox</u>, 127 F.3d 1416, 1419 (11th Cir.

1997).

**B.    Question Of Law.**

A district court's decision to grant or deny the defense of qualified immunity is a

question of law.  <u>See</u> <u>Chesser v. Sparks</u>, 248 F.3d 1117, 1121 (11th Cir. 2001).  "It  is

therefore appropriate for a district court to grant the defense of qualified immunity at the

motion to dismiss stage if the complaint 'fails to allege the violation of a clearly established

constitutional right'."  <u>Gonzalez v. Reno</u>, 325 F.3d 1228, 1233 (11th Cir. 2003), quoting

<u>Williams v. Ala. State Univ.</u>, 102 F.3d 1179, 1182 (11th Cir. 1997).

## III.   COUNT I - VIOLATION OF CONSTITUTIONAL RIGHTS.

### A.   12(b)(6) Motion To Dismiss Standard When Qualified Immunity Is At Issue.

Generally, a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  See In re Johannessen, 76 F.3d 347, 349 (11th Cir. 1996). However, when the affirmative defense of qualified immunity is raised in a Rule 12(b)(6) motion to dismiss, heightened pleading is required so that the court can evaluate whether the allegedly violated right was clearly established when the allegedly wrongful acts occurred. See Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir. 1992).  As noted by the Eleventh Circuit in GJR Investments, when a government official moves to dismiss a claim on the basis of qualified immunity, "the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined."  GJR Investments, 132 F.3d 1359, 1366 (11th Cir. 1998); See Wooten v. Campbell, 49 F.3d 696, 699 (11th Cir. 1995).  Even though Rule 8 of the Federal Rules of Civil Procedure generally gives a plaintiff considerable leeway in pleading his case, this heightened pleading requires more detailed allegations, because the court must have more specific information before it to evaluate adequately such a claim on a motion to dismiss.  See GJR Investments, 132 F.3d 1359, 1367.  Consequently, under current Eleventh Circuit law, a plaintiff pursuing a violation of his constitutional rights must come forward with specific facts, concerning each defendant, indicating that each defendant has not only violated a constitutional right, but a clearly established one.  Id.  Otherwise,

when presented with a motion to dismiss, the court must conclude that the defendants, sued in their individual capacities, are entitled to qualified immunity.  Id.

Moreover, in reviewing a motion to dismiss, we need only accept "well-pleaded facts" and "reasonable inferences drawn from those facts."  Oladeinde, 963 F.2d 1481, 1485. "Unsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal."  Marsh v. Butler County, Ala., 268 F.3d 1014, 1036 n. 16 (11th Cir. 2001).  We must also keep in mind the fact that we generally accord official conduct a presumption of legitimacy.  See United States Dep't. Of State v. Ray, 502 U.S. 164, 179 (1991).

### B.    Plaintiff's Fourth Amendment Claims.

In the instant case Plaintiff alleges a violation of his Fourth Amendment right to be free from unreasonable search and seizure.  Plaintiff claims that Defendant, an FBI agent, obtained a search warrant by making materially false statements in an affidavit to a magistrate judge.  Defendant argues that Plaintiff has failed to allege a violation of Plaintiff's constitutional rights under the Fourth Amendment; and therefore, the Defendant is entitled to qualified immunity.  Defendant's argument is well taken.

### 1.    Plaintiff's allegations of false statements by Defendant.

The Affidavit in Support of Applications for Search Warrant (Dkt. #41-2) executed by Defendant is over eleven (11) pages long and contains thirty-one (31) paragraphs detailing facts in support of finding probable cause for a search warrant.  Plaintiff has

disputed the veracity of portions of Paragraphs 8, 9, 11, 12, 13, 15, 29 and 30 of the Affidavit.[5]

Plaintiff attacks eight of the thirty-one paragraphs contained in the Affidavit.   In summary, Plaintiff alleges that the following statements made by Defendant Thomas in the Affidavit were false:

Paragraph 8:

"Bilzerian and Haire are involved in significant securities fraud involving Cimetrix."; Bilzerian "has hidden his ownership [of Cimetrix] in numerous accounts, and has failed to disclose his ownership of that stock in required filings to the Securities and Exchange Commission and the National Association of Securities Dealers."; "Bilzerian is involved in manipulating the price of Cimetrix's stock."; "Bilzerian is responsible for false and misleading press releases issued to the public in attempts to increase volume in stock sales."; "The manipulation of the stock price of Cimetrix has resulted in losses to investors throughout the United States and the Middle District of Florida."; Haire has assisted Bilzerian in hiding Cimetrix stock and obtaining discounted stock based on inside information."

Paragraph 9:

"In addition to securities fraud committed by Bilzerian, he has engaged in false bankruptcy filings in Tampa, Florida, in 2001."; "Bilzerian failed to list millions of dollars in assets that he has hidden in off-shore accounts, trust accounts, and with relatives, in his bankruptcy schedules filed with the Bankruptcy Court."; "Haire assisted Bilzerian by transferring $1,000,000.00 from Bilzerian's offshore accounts, which was not reported on Bilzerian's bankruptcy filing."

---

[5] While the Court does not determine the veracity of the information contained in these paragraphs upon a motion to dismiss, it appears that the information in Paragraphs 11, 13, 15, 29, and 30 was provided to Defendant by third parties.  Defendant was entitled to rely upon information provided to Defendant from reliable informants when submitting an affidavit in support of a search warrant.  See U.S. v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002).  Additionally, much of the information in Paragraphs 8 and 9 appears to summarize findings of fact made in Bilzerian's bankruptcy proceedings in the Middle District of Florida and contempt proceedings in the U.S. District Court for the District of Columbia, as well as facts alleged in previous and ongoing securities fraud related lawsuits filed by third parties against Bilzerian.

Paragraph 11:

"In the summer of 2000, CW-1 [Nelson Valdes] was present when Paul Bilzerian had one million dollars ($1,000,000) transferred from a secret off-shore account to Ernie Haire in Tampa, Florida."; "The attorney handling the transaction and Ernie Haire told CW-1 [Nelson Valdes] that Paul Bilzerian had wire transferred the one million dollars from a hidden off-shore account."

Paragraph 12:

"Bilzerian failed to disclose the one million dollar investment/promissory note to the bankruptcy court in his bankruptcy schedules."

Paragraph 13:

"In 2000, Ernie Haire advised CW-1 [Nelson Valdes] that Paul Bilzerian controlled millions of shares of Cimetrix stock.  Ernie Haire advised that he had personally invested three million dollars ($3,000,000) in Cimetrix stock with Bilzerian and that Bilzerian promised to quadruple Haire's stock's worth and guaranteed there would be no losses."; "Haire later gave one hundred thousand dollars ($100,000) in cash to Bilzerian to secretly purchase additional Cimetrix stock to be held in nominee accounts."; "Haire told CW-1 [Nelson Valdes] that due to pending lawsuits, Bilzerian placed Haire in charge of his children's trust accounts in which large quantities of Cimetrix stock were hidden."

Paragraph 15:

"Haire told CW-1 [Nelson Valdes] that Bilzerian kept his money in the Cook Islands and in his wife's name to keep the court from seizing it."; "In addition, Bilzerian placed Haire in charge of two trusts for Bilzerian's children and wife, Terri Steffen."; "Based on conversations with Haire and based on his/her personal conversations, CW-1 [Nelson Valdes] believes that currently there are documents relating to securities fraud and bankruptcy fraud inside Haire's residence at 16225 Villarreal de Avila, Tampa, Florida."

Paragraph 29:

Philip Martino was "one of the court appointed receivers to document Bilzerian's assets."; "Martino has received documents pertaining to Bilzerian's trusts on Ernie Haire, III's letterhead listing the 16225 Villareal [sic] de Avila,

Tampa, Florida address.  During discussions with Haire, Martino understood that Haire kept documents related to Bilzerian's trusts at his residence at 16225 Villarreal Avila, Tampa, Florida."; Martino had provided him with documents "that show wire transfers from Overseas Holding Ltd. Partnership, Cayman Island, accounts.  The documentation reflects that Haire is assisting Bilzerian in hiding monies unreported to the bankruptcy court in Tampa, Florida."; Martino provided him with "a copy of the $1,000,000 promissory note from Over Seas Holding Ltd. Partnership to Ernie Haire.  This $1,000,000.00 was not reported to the Tampa bankruptcy court."

Paragraph 30:

He had been provided "a chronology regarding Ernest Haire, III's acts assisting Paul Bilzerian in hiding assets from the bankruptcy court or hiding Cimetrix stock."[6]

## 2.   Determining civil liability.

In determining the question of civil liability for alleged misrepresentations in a search warrant affidavit, the court applies the same legal standard as established in Franks v. Delaware, 438 U.S. 154 (1978), for the suppression of evidence.  See Donaldson v. United States, 1993 WL 226432, *4 (N.D. Ill. 1993); see also Supreme Video Inc. v. Schauz, 808 F. Supp. 1380 (E.D. Wis. 1992); Olson v. Tyler, 771 F. 2d 277, 281 n. 6 (7th Cir. 1985).  In Franks v. Delaware, the Supreme Court held that:

where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires a [suppression] hearing be held at the defendant's request (emphasis supplied).  Franks at 155.

---

[6] It does not appear that Plaintiff is disputing the veracity or occurrence of the events listed in Paragraph 30, rather Plaintiff appears to dispute only whether such events provide "a chronology regarding Ernest Haire, III's acts assisting Paul Bilzerian in hiding assets from the bankruptcy court or hiding Cimetrix stock."

Applying this reasoning in the civil context, Defendant Thomas is not liable for the alleged misrepresentations in his warrant affidavit unless those same misrepresentations were necessary to the finding of probable cause.  See Supreme Video, 808 F. Supp. 1380, 1394.

> ### 3.   Two fundamental requirements must be established to invalidate a search warrant.

To invalidate a search warrant issued by a magistrate judge based on alleged false information, it is necessary to satisfy two fundamental requirements.  First, the party seeking to invalidate the warrant must prove that the law enforcement officer who sought the warrant deliberately lied to the magistrate or acted with reckless disregard for the truth.  See Franks, 438 U.S. 154, 171.[7]  The Eleventh Circuit defines "reckless disregard for the truth" to include instances where the affiant should have recognized the error, "or at least harbored serious doubts" about his representations.  United States v. Kirk, 781 F.2d 1498, 1503 (11th Cir. 1986).  Allegations of "negligence or innocent mistake" resulting in the submission of false information to a magistrate by a law enforcement officer are insufficient to invalidate a search warrant.  Id.  Nor may a challenge to a search warrant be properly predicated merely upon false information provided by third-parties that is relied upon by a law enforcement officer in an affidavit submitted in support of a search warrant.  Franks at 171-72.

Second, the challenging party must prove that the deliberately false information in the affidavit was essential or indispensable to the magistrate's finding of probable cause such

---

[7] "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."  Supreme Video, 808 F. Supp. 1380, 1394.

that when it is excised from the affidavit there is not a substantial basis remaining to support the magistrate's finding.  Franks at 171-72; Dahl v. Holley, 312 F.3d 1228, 1235 (11th Cir. 2002) (A warrant is valid if, "absent the misstatements or omissions, there remains sufficient content to support a finding of probable cause."); United States v. Kirk, 781 F.2d at 1505-07 (Affidavit redacted to eliminate reckless misstatement was sufficient to support a finding of probable cause.).  A violation has occurred only if the exclusion of the false information would have prevented a finding of probable cause.  See Franks at 171-72; see also Dahl v. Holley, 312 F.3d 1228, 1235 (11th Cir. 2002); Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997).

### C.    Probable Cause Analysis In Determining Validity Of Warrant.

The appropriate analysis is to determine whether probable cause is destroyed by removing the alleged misrepresentations from the warrant affidavit.  See Supreme Video at 1394.  If after removing the misrepresentations from the warrant affidavit there remains sufficient content in the warrant affidavit to support a finding of probable cause, no liability may be found.  See id.; see also Donaldson, 1993 WL 226432, * 4; U.S. v. Rivera, 738 F. Supp. 1208, 1213 (N.D. Ind. 1990).

### 1.    Under the totality-of-the-circumstances.

A finding of probable cause is appropriate when a magistrate has a "substantial basis for concluding" that a search would uncover evidence of wrongdoing.  See Illinois v. Gates, 462 U.S. 213, 236 (1983).  In Gates, the Supreme Court reaffirmed the totality-of-the-

circumstances analysis that traditionally has informed probable cause determinations citing

Jones v. United States, 362 U.S. 257, 271 (1960) and stated:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing] that probable cause existed.  Jones at 271.

Accordingly, this Court will consider whether under the totality of the circumstances there

is a substantial basis for concluding that probable cause existed supporting the issuance of

a search warrant after removing the alleged misrepresentations from the Affidavit.

**2.    Independent  probable  cause  evaluation,  excluding  disputed statements.**

Even if the complained of statements made by Defendant in Paragraphs 8, 9, 11, 12,

13, 15, 29 and 30 of the Affidavit were excluded, this Court concludes as a matter of law that

under the totality of the circumstances the remaining statements in the Affidavit provide a

substantial basis to support a finding of probable cause.[8]

The following information, the truth of which has not been challenged, was also a part

of the Affidavit:

Paragraphs 1- 6:

---

[8] Whether a search warrant affidavit offers sufficient facts to establish probable cause of a federal crime is a question of law.  See U.S. v. Miller, 24 F.3d 1357, 1360 (11th Cir. 1994).

Provide background information regarding Kelley Thomas' training, expertise and personal participation in the investigation of Paul Bilzerian in relation to Bilzerian's involvement in bankruptcy fraud and securities fraud.

Undisputed Portion of Paragraph 8:

"...Bilzerian has controlled Cimetrix and its stock issuance for over five years. Bilzerian controls millions of shares of stock..."

Undisputed Portion of Paragraph 9:

"...In January 2001, Bilzerian filed a Chapter 7 bankruptcy proceeding in the United States Bankruptcy Court, Middle District of Florida, Case No. 01-00076-8W7...Bilzerian is currently incarcerated in a federal detention center for his failure to disclose and disgorge hidden assets to a United States Judge in Washington, D.C., which is further described in Paragraph 23 of this affidavit..."

Undisputed Portion of Paragraph 11:

"...Haire subsequently transferred the one million dollars, pursuant to a promissory note, to a business in the Bradenton, Florida area..."

Undisputed Portion of Paragraph 12:

"...Your affiant has reviewed the bankruptcy filings by Paul Bilzerian and the $1,000,000 investment/promissory note is not listed..."

Undisputed Portion of Paragraph 15:

"During the June 4, 2001 visit at Haire's residence, Haire told CW-1 that because Paul Bilzerian loaned him $1,000,000.00 without the court's knowledge, that the court had recently froze one of his accounts that contained Cimetrix stock...Haire told CW-1 that he had put some documents in his residence safe..."

Undisputed Portion of Paragraph 29:

"In May 2001, Philip Martino...had contact with Ernest Haire, III..."

Undisputed Portion of Paragraph 30:

"April 1, 1998:     Haire transfers 75,000 shares of Cimetrix stock to the Steffens and Loving Spirit Foundation (controlled by Bilzerian's wife and Haire).  Haire wired $300,000.00 to the same entities.

April 15, 2000:     Haire receives 75,000 shares of Cimetrix stock from Loving Spirit Foundation.

July 11, 2000:     Haire signs a stock pledge agreement with Overseas Holding Ltd. Partnership (OHLP) for over 600,000 shares of Cimetrix stock.

July 12, 2000:     Haire signs a $1,000,000.00 promissory note to Overseas Holding Ltd. Partnership.

March 2, 2001:     Bilzerian issues a $20,000.00 promissory note to Haire.

March 16, 2001:     Haire forwards $67,500 to OHLP."

Paragraphs 10 and 14:

Provide information provided by Cooperating Witness (CW-1) regarding Ernest Haire and Bilzerian.  Affiant believed that CW-1's information was reliable and accurate because it was corroborated by other witnesses and documents.  CW-1 provided information which proved to be true and accurate in a separate case to the FBI in 2000.  On June 4, 2001 (three days prior to the submission of the Affidavit), CW-1 met with Ernest Haire at Haire's residence at 16225 Villareal de Avila, Tampa, Florida.  CW-1 observed the following inside the residence: (a) Bank of America statements and documents; (b) Documents relating to Bilzerian and the Securities and Exchange Commission lawsuit against Bilzerian; and c) Cimetrix stock papers.

Paragraph 16:

Provides information regarding Bilzerian's conviction for securities fraud and conspiracy to defraud the United States in the Southern District of New York, as well as, the civil suit against Bilzerian which resulted in a civil judgment against Bilzerian in the amount of $33,140,777.00.

Paragraph 17:

Provides information regarding Bilzerian's relationship with Cimetrix and the transfer of twenty percent (20%) of the common stock of Cimetrix to Bicoastal Holding Company.

Paragraph 18:

Provides information regarding a lawsuit filed against Bilzerian for conspiracy to artificially maintain the market price of Cimetrix stock.

Paragraph 19:

Provides information regarding Cimetrix's failure to notify the public that Paul Bilzerian had a prior conviction for securities fraud in violation of Title 15, United States Code, Section 78j.

Paragraph 20:

Provides information regarding Bilzerian's assets tracked by the SEC and Thomas, including the following bank accounts: a) 1995 Cook Islands Revocable Trust; b) Overseas Holding Company; c) Bicoastal Holding Company, d) Overseas Holding Limited Partnership; and e) 1994 Irrevocable Trust for Children. These entities control in excess of 3 million shares of Cimetrix. Bilzerian has attempted to place all his assets in the these entities or in the name of his wife. In its 10k filing, Cimetrix failed to identify Bilzerian or his family's control of the three million shares of stock. This failure to advise the public of a convicted felon's possession of a significant majority of corporate shares is false and misleading, in violation of Title 15, United States Code, Section 78j.

Paragraph 21:

Provides information regarding a false or misleading press release by Bilzerian.

Paragraph 22:

Provides information regarding Bilzerian's voluntary petition for Chapter 7 bankruptcy in the U.S. Bankruptcy Court in the Middle District of Florida. Bilzerian listed assets less than $30,000. Bilzerian failed to document: a)

proceeds from the sale of his 33,000 square foot house in Tampa, Florida; b) real estate owned in Minnesota; c) 180,000 shares of Cimetrix with Overseas Holding Company; d) 180,000 shares of Cimetrix with Bicoastal Holding Company; and e) over $40,000 in annual income from Cimetrix.

Paragraph 23:

Provides information regarding a January 12, 2001 Opinion entered by the United States Court for the District of Columbia.[9]  The Opinion states and finds, in pertinent part: a) in 1991, the Court found Bilzerian liable for securities fraud; b) in 1993, the Court ordered Bilzerian to disgorge $33,140,787.07 in profits gained from fraud; c) in 1998, the 11th Circuit affirmed the ruling of the Middle District of Florida that the disgorgement judgment against Bilzerian was not dischargeable in bankruptcy; d) on August 21, 2000, the Court found Bilzerian in contempt of the 1993 disgorgement orders since Bilzerian's financial inability to comply was self-created because Bilzerian had separated his assets from himself and funneled them to shell companies, partnerships, and trust entities through outright transfers as well as payment arrangements made with his employer Cimetrix; e) the Court identified the "Bilzerian related entities" as Terri L. Steffan Revocable Trust of 1995 (the "Family Trust"), Paul A. Bilzerian and Terri L. Steffan Irrevocable Trust of 1994 (the "Children's Trust"), Bicoastal Holding Company, Overseas Holdings Limited Partnership, and Overseas Holding Company; f) Bilzerian failed to provide financial records or information with respect to these five entities; g) instead of providing documents Bilzerian said that the trustees of the Family Trust and the Children's Trust declined to turn over documents to him; h) Bilzerian identified Ernest Haire, III as the Trustee for the Children's Trust and indicated that Mr. Haire would be willing to provide the Court with the trust documents only under certain conditions maintaining the confidentiality of the documents; I) in 1997, Bilzerian transferred the ownership of his home by him and his wife to Overseas Holdings Limited Partnership; j) Bilzerian indicated that he had a bank account with Bank of America but failed to provide any account statements; and k) as a result of Bilzerian's refusal to provide financial information and other relevant documentation regarding the "Bilzerian related entities" the Court ordered Bilzerian to be incarcerated until he provided the information covered by the Court's order.

---

[9] See Dkt. #41-2, Opinion, referenced as "Attachment D" to Affidavit, dated January 12, 2001.

Additionally, Paragraph 23 provides information regarding an Order Granting Ex Parte Temporary Asset Freeze and Other Relief entered on May 11, 2001 by the United States Court for the District of Columbia.[10]  The Order Granting Ex Parte Temporary Asset Freeze and Other Relief states and finds, in pertinent part: a) the 1994 Trust, the 1995 Trust, OHC (Overseas Holding Company), OHLP (Overseas Holding Limited Partnership), Bicoastal, Loving Spirit, and Puma are entities in which Paul A. Bilzerian has an interest; b) Bilzerian has an interest in all of the assets of the 1995 Trust, OHC, OHLP, Bicoastal, and Loving Spirit; c) Bilzerian has an interest in the Cimetrix securities held by the 1994 Trust, Puma, or Ernest Haire and any proceeds from the sale of such securities; d) there is good cause to believe that, unless restrained and enjoined by order of this Court, each of the Bilzerian entities or Ernest Haire will dissipate, conceal, or transfer from the jurisdiction of this Court or encumber assets which are properly part of the Receivership Estate in this action; e) there is good cause to believe that, unless restrained and enjoined by order of this Court, the respondents, and each of them, may alter or destroy documents relevant to this action, or transfer them to offshore locations; f) the Court ordered Ernest Haire to hold and retain within his control, and otherwise prevent any transfer of Cimetrix stock, warrants, and bonds, any interest payments generated from such securities, and any proceeds from the sale of such securities, presently held by him, under his control or over which he exercised actual or apparent investment or other authority and shall not make any disposition of such securities without prior approval of this Court; g) the Court ordered any financial or brokerage institution within the jurisdiction of the U.S. Courts and holding any Cimetrix Securities or proceeds for the sale of such securities, received from the 1994 Trust, the 1995 Trust, OHC, OHLP, Bicoastal, Loving Spirit, Puma, or Ernest Haire, in the name of, for the direct benefit, or under control of any of those entities or individuals, to hold and retain within its control and prohibit the withdrawal, removal, transfer, or other disposal of any such Cimetrix Securities; the Court ordered Ernest Haire to deliver to counsel for the Receiver, counsel for the SEC, counsel for the Intervenors, and counsel for Bilzerian by May 16, 2001 all documents previously requested by the Receiver in her letters of December 2000 and February 2001; h) the Court further ordered Ernest Haire to restrain from destroying, mutilating, concealing, altering or disposing of any document relating in any manner to any of the subject matters contained in the Receiver's December 2000 and February 2001 access demands (including information regarding Cimetrix Securities or the location and disposition of funds received

---

[10]  See Dkt. #41-2, Order Granting Ex Parte Temporary Asset Freeze and Other Relief, referenced as "Attachment E" to the Affidavit, dated May 11, 2001.

by respondents from any other person or entity in connection with the transfer of Cimetrix Securities).

Paragraph 24:

In May of 2001, Judith Starr, Assistant Legal Counsel for the SEC, provided documents to Defendant from the Cimetrix transfer agent reflecting transfers of over 1,000,000 shares of Cimetrix stock to Ernest Haire.

Paragraph 25:

On May 9, 2001, Thomas retrieved documents from the trash outside of Bilzerian's residence evidencing, among other items, bank documents from SunTrust Bank and AmSouth Bank, phone bills related to the residence, credit card data, personal notes, including "please hang on to all the banking info."

Paragraph 26:

On May 18, 2001, Thomas retrieved documents from the trash outside of Bilzerian's residence evidencing, among other items, a letter from Overseas Holding Limited Partnership to Ernest Haire regarding notes and stock certificates.

Paragraph 27:

On May 22, 2001, Thomas retrieved documents from the trash outside of Bilzerian's residence evidencing Cook Island Registration documents and a letter from Bicoastal Holdings to the Cook Islands regarding wire transfers and the placement of over three million shares of Cimetrix stock.

Paragraph 28:

On June 1, 2001, Thomas retrieved documents from the trash outside of Bilzerian's residence evidencing, among other items, faxes regarding wire instructions with Ernest Haire and moving money from one trust to another and asset transfer documents for Bicoastal Holding Company and Overseas Holding Ltd. Partnership listing over 3,000,000 shares of Cimetrix in the accounts and $1,000,000 with Ernest Haire.

Paragraph 31:

Based on the information contained in the Affidavit, Thomas believed that there was probable cause to search the premises at 16229 Villareal de Avila, Tampa, Florida, and 16225 Villareal de Avila, Tampa, Florida, for items that would constitute evidence of violations of the federal criminal statutes referenced therein.

Based on the undisputed information contained in or incorporated within the Affidavit, it appears to this Court that under the totality of the circumstances there was a substantial basis to conclude that at the time the Affidavit was submitted a search of Plaintiff's residence would uncover evidence of wrongdoing. Thus, probable cause existed independent of the allegedly false statements.

### 3.     Search warrant remains valid.

Since probable cause existed, even after excluding the allegedly false statements complained of by Plaintiff, the search warrant at issue remains valid. The search of Plaintiff's residence based on a valid search warrant does not violate Plaintiff's constitutional rights. Thus, Plaintiff has failed to plead an essential element of bringing a civil rights suit against a government official, to wit: that Defendant's actions violated a clearly established constitutional right. As a result of Plaintiff's inability to plead a violation of his constitutional rights under the Fourth Amendment, this Court finds that Defendant is entitled to qualified immunity from liability in relation to this lawsuit.

For these reasons, Count I of Plaintiff's Second Amended Complaint is dismissed with prejudice.

## IV.    COUNT II - PERMANENT INJUNCTION.

### A.    Plaintiff's Request For Injunctive Relief.

In Count II, Plaintiff has brought an action for permanent injunctive relief against "Thomas, his agents, servants, employees, attorneys, and any person in active concert or participation with him" from threatening or intimidating Plaintiff, Plaintiff's family, Plaintiff's business enterprises, and any witness in this case.

Defendant argues that Plaintiff lacks standing to pursue claims for equitable relief and that this Court lacks subject matter jurisdiction over this issue. Defendant's argument is well taken.

### B.    12(b)(1) Motion To Dismiss Standard.

Attacks on subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) come in two forms. "Facial attacks" on the complaint "require the court to merely look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." Anderson v. U.S., 245 F.Supp.2d 1217, 1220 (M.D. Fla. 2002); Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980). "Factual attacks," on the other hand, challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." Menchaca, 613 F.2d at 511.

These two forms of attack differ substantially. Anderson, 245 F.Supp.2d at 1221. On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion - the court must consider the allegations of the complaint to be true.

Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981).   But when the attack is factual, the trial court may proceed as it never could under 12(b)(6).   Anderson at 1221.   Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction - its very power to hear the case - there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.   See id.   In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merit of jurisdictional claims.   Id.

### 1.       Plaintiff fails to show immediate danger.

In order to meet the constitutional minimum of standing to seek injunctive relief, plaintiff must carry the burden of establishing the "he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." City of Los Angeles v. Lyons, 461 U.S. 95, 101-102 (1983).   In doing this, plaintiff cannot rely merely on past injury to satisfy the injury requirement but must show a likelihood that he will be injured in the future.   See O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)(holding that past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects). Finally, abstract injury is not enough; rather, "[t]he injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" O'Shea, 414 U.S. at 494.

Plaintiff has alleged that Defendant told a third party, "I'm going to kick Ernie Haire's ass.  I'll put something on him that Ajax won't take off.  I'm gonna get Ernie Haire good."

Plaintiff has not alleged that Defendant said anything directly to Plaintiff or alleged other actions on the part of Defendant that would show a likelihood that Plaintiff will be injured in the future.  The remainder of Plaintiff's allegations concern allegations of intimidation by Defendant of the FBI's confidential informant, Valdes.[11]

Accordingly, Plaintiff has failed to establish that he is in immediate danger of sustaining direct injury by Defendant.  Thus, Plaintiff lacks standing to seek equitable relief.

### 2.    Court lacks subject matter jurisdiction against non-parties.

Plaintiff seeks an injunction against "Thomas, his agents, servants, employees, attorneys, and any person in active concert or participation with him", however, only Thomas is a party to this action.  The persons from whom injunctive relief is sought must be parties to the underlying action.  See In re Infant Formula Antitrust Litigation, MDL 878 v. Abbott Laboratories, 72 F.3d 842, 843 (11th Cir. 1995) (court lacks subject matter jurisdiction to issue preliminary or permanent injunction against non-party).

Accordingly, this Court lacks subject matter jurisdiction over an action requesting relief pursuant to a permanent injunction against Defendant "agents, servants, employees, attorneys, and any person in active concert or participation with him".

Fore these reasons, Count II of Plaintiff's Second Amended Complaint is dismissed.

It is therefore ORDERED AND ADJUDGED that:

1.    Defendant's Motion to Dismiss (Dkt. #40) is GRANTED.

---

[11] Plaintiff does not have standing to seek an injunction against Defendant on behalf of Valdes, nor is Valdes a party to this lawsuit.

2.      Plaintiff's Second Amended Complaint, Request for Injunctive Relief, and Demand for Jury Trial (Dkt. #33) is dismissed with prejudice.

3.      Plaintiff's Motion for Leave to Conduct Limited Discovery Prior to Mediation or, Alternatively, to Defer Mediation (Dkt. #44) is DENIED as moot.

4.      The Clerk is directed to close this case and terminate all pending motions.

**DONE** and **ORDERED** in Tampa, Florida on March 29, 2006.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2005\05-cv-1018.mtd2 final.wpd